Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2020 08:08 AM CDT

State of Nebraska, appellee, v.
Patrick W. Schroeder, appellant.
___ N.W.2d ___

Filed April 17, 2020.    No. S-18-582.

1. **Sentences: Death Penalty: Appeal and Error.** In a capital sentencing proceeding, the Nebraska Supreme Court conducts an independent review of the record to determine if the evidence is sufficient to support imposition of the death penalty.

2. **Sentences: Aggravating and Mitigating Circumstances: Appeal and Error.** When reviewing the sufficiency of the evidence to sustain the trier of fact's finding of an aggravating circumstance, the relevant question for the Nebraska Supreme Court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the aggravating circumstance beyond a reasonable doubt.

3. ____: ____: ____. A sentencing panel's determination of the existence or nonexistence of a mitigating circumstance is subject to de novo review by the Nebraska Supreme Court.

4. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.

5. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

6. **Constitutional Law: Statutes: Appeal and Error.** The constitutionality of a statute presents a question of law, which an appellate court independently reviews.

7. **Sentences: Death Penalty: Homicide: Aggravating and Mitigating Circumstances: Appeal and Error.** Under Nebraska law, the death

penalty is imposed for a conviction of murder in the first degree only in those instances when the aggravating circumstances existing in connection with the crime outweigh the mitigating circumstances.

8. **Trial: Rebuttal Evidence.** Rebuttal evidence is confined to new matters first introduced by the opposing party and limited to that which explains, disproves, or counteracts the opposing party's evidence.

9. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Evidence.** In a death penalty case, a sentencing panel has the discretion to hear evidence to address potential mitigating circumstances regardless of whether the defendant presents evidence on that issue.

10. **Sentences: Evidence.** A sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence.

11. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Evidence.** In a death penalty case, a sentencing panel may permit the State to present evidence to contradict potential mitigators even though a defendant failed to present affirmative evidence.

12. **Sentences: Death Penalty: Homicide.** A sentencing order in a death penalty case must specify the factors the sentencing panel relied upon in reaching its decision and focus on the individual circumstances of each homicide and each defendant.

13. **Constitutional Law: Sentences: Death Penalty: Aggravating and Mitigating Circumstances.** The U.S. Constitution does not require the sentencing judge or judges to make specific written findings in death penalty cases with regard to nonstatutory mitigating factors.

14. **Sentences: Aggravating and Mitigating Circumstances: Appeal and Error.** The Nebraska Supreme Court will not fault a sentencing panel for failing to discuss a nonstatutory mitigating circumstance that it was not specifically asked to consider.

15. **Death Penalty: Aggravating and Mitigating Circumstances.** During the consideration of statutory mitigating factors in a death penalty case, the mere identification of a history of incarceration, without more, is insufficient to allege unusual pressures or influences or establish extreme mental or emotional disturbance.

16. **Sentences: Homicide: Aggravating and Mitigating Circumstances: Judgments: Juries: Presentence Reports.** When an offender has been convicted of first degree murder and waives the right to a jury determination of an alleged aggravating circumstance, the court must order a presentence investigation of the offender and the panel must consider a written report of such investigation in its sentencing determination.

17. **Presentence Reports.** A presentence investigation and report shall include, when available, any submitted victim statements and an analysis of the circumstances attending the commission of the crime and the offender's history of delinquency or criminality, physical and mental condition, family situation and background, economic status, education, occupation, and personal habits.

18. **Presentence Reports: Probation and Parole.** A presentence investigation and report may include any matters the probation officer deems relevant or the court directs to be included.

19. **Constitutional Law: Criminal Law: Sentences: Right to Counsel.** An accused has a state and federal constitutional right to be represented by an attorney in all critical stages of a criminal prosecution which can lead to a sentence of confinement.

20. **Right to Counsel: Waiver.** A defendant may waive the right to counsel so long as the waiver is made knowingly, voluntarily, and intelligently.

21. **Constitutional Law: Right to Counsel.** The same constitutional provisions that provide a defendant the right to counsel also guarantee the right of the accused to represent himself or herself.

22. **Attorney and Client.** The right to self-representation plainly encompasses certain specific rights of the defendant to have his voice heard, including that the pro se defendant must be allowed to control the organization and content of his own defense.

23. **Sentences: Death Penalty: Attorney and Client: Aggravating and Mitigating Circumstances: Evidence: Waiver.** Control of the organization and content of a defense may include a waiver of the right to present mitigating evidence during sentencing in a death penalty case.

24. **Criminal Law: Sentences: Death Penalty: Appeal and Error.** Because a death sentence is different from any other criminal penalty and no system based on human judgment is infallible, the Nebraska Supreme Court has taken, and should continue to take, the extra step to ensure fairness and accuracy with the imposition of the death penalty.

25. **Criminal Law: Statutes.** Penal statutes are to be strictly construed in favor of the defendant.

26. **Sentences: Evidence: Presentence Reports.** Even if the State presents evidence in favor of a specific sentence and the defendant declines to present contrary evidence, a court receives and must consider independent information from a presentence investigation report.

27. **Sentences: Death Penalty: Evidence: Presentence Reports.** In a death penalty case, a sentencing panel is required to review a presentence investigation report and determine whether it contradicts the State's evidence of aggravating factors and whether any mitigating circumstances exist, including specifically delineated statutory mitigators.

28. **Death Penalty: Aggravating and Mitigating Circumstances: Proof.** While the State must prove aggravating circumstances beyond a reasonable doubt in a death penalty case, there is no burden of proof with regard to mitigating circumstances.

29. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Judgments.** Once a sentencing panel in a death penalty case makes its determinations about the existence of aggravating and mitigating circumstances, the panel is then required to undertake a proportionality review.

30. **Criminal Law: Sentences: Death Penalty: Words and Phrases.** A proportionality review in a death penalty case looks at whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Proportionality review is not constitutionally mandated.

31. **Sentences: Death Penalty: Statutes: Appeal and Error.** The proportionality review in a death penalty case exists in Nebraska by virtue of statutes which direct the Nebraska Supreme Court to conduct a proportionality review in each appeal in which a death sentence is imposed.

32. **Sentences: Death Penalty.** A court's proportionality review spans all previous cases in which a sentence of death is imposed and is not dependent on which cases are put forward by the parties.

33. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Judgments: Juries.** Even when a jury determines the existence of an aggravating circumstance, a sentencing panel is required to put in writing its consideration of whether the determined aggravating circumstance justifies the imposition of a sentence of death, whether mitigating circumstances exist, and whether a sentence of death would be excessive or disproportionate to penalties imposed in similar cases.

34. ____: ____: ____: ____: ____. A sentencing panel's order imposing a sentence of death where a jury has determined the existence of an aggravating circumstance must specifically refer to the aggravating and mitigating circumstances weighed in the determination of the panel.

35. **Sentences: Death Penalty: Statutes.** Nebraska's capital sentencing scheme provides additional statutory steps and considerations to ensure fairness and accuracy, and these safeguards exist regardless of a defendant's strategy at the penalty phase.

36. **Sentences: Death Penalty.** Due to Nebraska's statutory capital sentencing scheme, a defendant cannot "choose" the death penalty.

37. **Courts: Sentences: Death Penalty.** A sentencing decision in a death penalty case rests with the court alone.

38. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Evidence: Presentence Reports.** In order to sentence a

defendant to death, the statutory scheme requires that a sentencing panel consider not only evidence and argument presented by the parties but also an independently compiled presentence investigation report to determine whether the alleged aggravating circumstance exists, determine whether any mitigating factors are present which would weigh against the imposition of the death penalty, and conduct a proportionality review weighing the aggravating and mitigating factors and comparing the facts to previous cases where the death penalty was imposed.

39. **Trial: Parties.** A defendant is entitled to present a defense and is guaranteed the right to choose the objectives for that defense.

40. **Attorney and Client.** A self-represented defendant must be allowed to control the organization and content of his own defense.

41. **Constitutional Law: Right to Counsel: Sentences: Aggravating and Mitigating Circumstances: Evidence: Waiver.** When a defendant waives counsel and the presentation of mitigating evidence, the appointment of an advocate to present evidence and argue against the imposition of a sentence overrides that defendant's constitutional right to control the organization and content of his or her own defense during sentencing.

42. **Right to Counsel: Waiver.** A criminal defendant has the right to waive counsel and present his or her own defense.

43. **Sentences: Death Penalty: Right to Counsel: Evidence: Waiver.** In a death penalty case, a defendant's right to waive counsel and present his or her own defense includes the right of the defendant to elect not to present additional evidence or argument during the penalty proceedings.

44. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.

45. ____: ____: ____: ____. In reviewing a sentence of death, the Nebraska Supreme Court considers whether the aggravating circumstances justify imposition of a sentence of death and whether any mitigating circumstances found to exist approach or exceed the weight given to the aggravating circumstances.

46. ____: ____: ____: ____. The Nebraska Supreme Court is required, upon appeal, to determine the propriety of a death sentence by conducting a proportionality review, comparing the aggravating and mitigating circumstances with those present in other cases in which a court imposed the death penalty.

47. **Sentences: Death Penalty.** The purpose of a proportionality review in a death penalty case is to ensure that the sentences imposed in a case are

no greater than those imposed in other cases with the same or similar circumstances.

48. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** The Nebraska Supreme Court's proportionality review looks only to other cases in which the death penalty has been imposed and requires the court to compare the aggravating and mitigating circumstances of the case on appeal with those present in those other cases.

49. **Death Penalty.** A proportionality review in a death penalty case does not require that a court "color match" cases precisely.

50. **Sentences: Death Penalty.** The question when conducting a proportionality review in a death penalty case is simply whether the cases being compared are sufficiently similar, considering both the crime and the defendant, to provide the court with a useful frame of reference for evaluating the sentence in the instant case.

51. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances.** One aggravating circumstance may be sufficient under Nebraska's statutory system for the imposition of the death penalty.

52. **____: ____: ____.** In a proportionality review, the evaluation of whether the death penalty should be imposed in a specific case is not a mere counting process of "X" number of aggravating circumstances and "Y" number of mitigating circumstances and, instead, asks whether the reviewed cases are sufficiently similar to provide a useful reference for that evaluation.

Appeal from the District Court for Johnson County: Vicky L. Johnson, Judge. Affirmed.

Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith, Solicitor General, for appellee.

Christopher L. Eickholt, of Eickholt Law, L.L.C., Cassandra Stubbs, of American Civil Liberties Union Foundation, and Amy A. Miller, of ACLU of Nebraska Foundation, for amicus curiae ACLU and ACLU of Nebraska.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Moore, Chief Judge.

Funke, J.

Patrick W. Schroeder appeals his sentence of death for first degree murder of Terry Berry, Jr. This is a mandatory direct appeal pursuant to Neb. Rev. Stat. § 29-2525 (Cum. Supp. 2018) and article I, § 23, of the Nebraska Constitution. Schroeder waived counsel, pled guilty without a plea agreement, waived the right to a jury on the issue of aggravating factors, declined to present evidence of aggravating or mitigating factors, and declined to cooperate for the preparation of the presentence investigation report.

On appeal, Schroeder was appointed counsel and now contends that the sentencing panel erred in allowing the State to introduce evidence to refute unpresented mitigating evidence, failing to consider and weigh mitigating evidence from the presentence investigation report, failing to request documentation from the Department of Correctional Services (DCS) of Schroeder's time in custody for mitigation purposes, sentencing Schroeder to death with insufficient safeguards to prevent arbitrary results, and finding Schroeder should be sentenced to death after balancing the aggravating evidence and mitigating evidence. For the reasons set forth herein, we affirm.

## BACKGROUND

### Factual Background

At the time of the events leading to Schroeder's instant conviction, Schroeder was incarcerated at Tecumseh State Correctional Institution (TSCI). This incarceration was pursuant to a 2007 conviction for the first degree murder of Kenneth Albers in which Schroeder was sentenced to life imprisonment.

In March 2017, while housed in a cell intended for one occupant, Schroeder was asked if he would consider a roommate due to overcrowding. Schroeder agreed but wanted a roommate with whom he was compatible. Prison officials assigned Berry to Schroeder's cell. Schroeder did not consider Berry to be compatible with him and told prison officials that he did not want Berry as a cellmate. Schroeder did not know

Berry personally before the assignment but knew of Berry as "'a loudmouth, a punk.'" Berry was 22 years old and convicted of second degree forgery and a confined person violation. Berry was due for release approximately 2 weeks after his assignment to Schroeder's cell.

Schroeder had described Berry as a constant talker with extremely poor hygiene. During their shared confinement, Schroeder would urge Berry to be quieter and clean up after himself. Schroeder alleged that he had told prison staff that placing Berry with him would be an unworkable, bad arrangement. Schroeder described that prison staff who came by his cell would acknowledge the poor fit and even joke that it was surprising Schroeder had not killed Berry yet. By April 13, 2017, Schroeder decided to himself that "'[s]omething was gonna happen'" if Berry was not moved.

On April 15, 2017, Berry was watching "UFC" on television in the cell and, as Schroeder explained, Berry "'would not shut up.'" Schroeder instructed Berry to move his chair to face the television with his back to Schroeder. Schroeder proceeded to put Berry in a chokehold and locked his hands. He continued to choke Berry for about 5 minutes until his arms got tired and then took a nearby towel, wrapped it around Berry's neck, and continued to choke him for about 5 more minutes. At that point, Schroeder let up on the towel, believing Berry was dead. Schroeder claimed he then tried to push the call button in his cell to alert staff to Berry's condition. Around 30 minutes later, Schroeder alerted a passing guard that Berry was on the floor by asking, "'How do you deal with a dead body in a cell?'" The guard believed Schroeder was joking until Schroeder picked up and dropped Berry's leg. Schroeder has stated that he summoned the guard not for Berry's benefit, but because he wanted Berry's body removed from the cell.

Berry was transported to a medical facility. On April 19, 2017, Berry died, having been declared brain dead. A search of the cell revealed a torn "kite," a form inmates use to communicate with prison staff, dated April 13, 2017, and located in

the trash. The discarded kite stated that prison staff had to get Berry out of the cell before he got hurt.

## Procedural Background

Pursuant to these events, Schroeder was charged in April 2017 with first degree murder and use of a weapon to commit a felony. Within an information filed in June, the State submitted a notice of aggravation alleging Schroeder had been convicted of another murder, been convicted of a crime involving the use or threat of violence to the person, or had a substantial prior history of serious assaultive or terrorizing criminal activity.[1] Schroeder was appointed counsel and entered a plea of not guilty.

A hearing was held following Schroeder's subsequent request to dismiss counsel and represent himself. The court granted Schroeder's motion and discharged his counsel but also appointed that same counsel to act in a standby role. Representing himself, Schroeder withdrew a pending motion to quash and requested leave to withdraw his prior plea of not guilty. The court granted Schroeder leave to withdraw his prior plea and rearraigned him. Thereafter, Schroeder pled guilty to both counts and the court found him guilty of those charges beyond a reasonable doubt.

## Presentence Investigation Report

The court ordered a presentence investigation report. Schroeder declined to answer questions or participate in its preparation. However, the current report did attach the 2007 presentence investigation report from Schroeder's earlier convictions, which supplies more background information.

According to the report, Schroeder was born in June 1977. Schroeder's biological father abandoned his family when Schroeder was an infant. Schroeder's mother and stepfather raised him in his early years. Schroeder described his stepfather as an alcoholic. Schroeder's mother and stepfather separated

---

[1] See Neb. Rev. Stat. § 29-2523(1)(a) (Cum. Supp. 2018).

when Schroeder was 9 years old, and Schroeder moved with his mother to Kearney, Nebraska. Schroeder has not had contact with his stepfather since he was 12 years old. Schroeder has two older brothers but, at the time of the 2007 report, was not close to either of them. While Schroeder's biological father did take him in for a brief period of time when he was 12 years old, Schroeder was removed and sent to a juvenile facility because his father caught him smoking marijuana. Schroeder denied being abused or neglected and described his childhood as "'typical.'" Schroeder has a history of "placement in foster care and group home situations including a number of runaways." At one point as a teenager, Schroeder was placed with his grandparents for a period of time.

Schroeder was married in 1998 and has one child from that marriage, but the couple has since divorced. At the time of the 2007 report, Schroeder described that the child was adopted by his ex-wife's present husband and that Schroeder has no contact with the child. Schroeder remarried in 2003, and his wife had three children from prior relationships. However, Schroeder said in the 2007 report that while the couple was then together, he expected the situation to change under the circumstances.

The presentence investigation report provides that Schroeder has an eighth grade education. Before he was incarcerated in 2007, he had been employed in various farmwork and construction jobs.

Schroeder reported that he first used alcohol when he was 13 years old and that he experimented with marijuana and cocaine when he was 15 years old. Schroeder also admitted he had used methamphetamine on a daily basis for approximately 3 to 4 months, with the last use in 2003. While Schroeder denied receiving treatment, previous prison records indicated he was placed in substance abuse programming in 1991. Schroeder asserted that from April 2005 until his 2006 arrest, he was "'hooked on opiates'" and was taking between 500 and 800 pills per month, some of which were prescribed and some of which were not.

The report explained that in 1985, Schroeder was first charged with criminal mischief in juvenile court when he was 12 years old. Between 1987 and 1992, Schroeder was also charged in juvenile court with aiding and abetting, escape, theft, minor in possession of alcohol, and theft by exercising control. He was ordered to serve probation as well as being placed in the Youth Rehabilitation and Treatment Center in Kearney.

Since reaching the age of majority, in addition to his 2007 convictions, Schroeder has been convicted of bank robbery, forgery, escape, theft, assault, driving under suspension, contributing to the delinquency of a child, driving under the influence, and issuing bad checks. He has been sentenced to multiple terms of incarceration and terms of supervision. He has had two of his terms of probation revoked and completed others unsatisfactorily.

## Sentencing Proceedings

A scheduling hearing was held in August 2017. Schroeder waived his right to a jury for a determination of the aggravation allegation. The court accepted this waiver after making inquiry and finding, beyond a reasonable doubt, that Schroeder was competent and that his decision was made freely, voluntarily, knowingly, and intelligently. Thereafter, a three-judge panel was convened for a sentencing hearing on Schroeder's first degree murder conviction.

On the aggravation allegation, the State presented evidence of Schroeder's 2007 conviction for Albers' murder. A sergeant with the Nebraska State Patrol testified that he was the lead investigator for that case. His testimony and a video of his interview with Schroeder described that Albers was a 75-year-old farmer who had previously employed Schroeder. Believing Albers had several thousand dollars in cash at his residence, Schroeder had driven to Albers' house, rung the doorbell, entered the home, and awakened Albers. Schroeder demanded money, threatened Albers, and hit him in the head with a nightstick. Albers recognized Schroeder during this

exchange and called him by name. Schroeder forced Albers to open a lockbox in which Schroeder believed the cash was kept, after which Schroeder took Albers outside to an adjacent shop. At the shop, Albers turned toward Schroeder, attempting to defend himself. Schroeder struck Albers with the nightstick four or five times. With Albers on the floor, Schroeder dragged him out of the shop, tied him up with battery cables, and placed him in the back of Albers' pickup. Schroeder then drove Albers, who was still alive, to an abandoned well on the property and dumped him into it. Schroeder explained to the sergeant that he had made the decision to kill Albers a few days before the robbery. The doctor who performed the autopsy on Albers testified that the cause of Albers' death was blunt force trauma to his head.

Schroeder declined to cross-examine the State's witnesses, present rebuttal evidence, or argue against the State's claim on the aggravation allegation.

As to mitigating factors, Schroeder again declined to present any evidence or argument. However, the State requested, and the court granted, permission to present evidence to negate possible statutory mitigating circumstances. Here, the State presented evidence related to Berry's murder. Investigator Stacie Lundgren of the Nebraska State Patrol testified to her interview with Schroeder where he described how and why he killed Berry. This interview was also described in the presentence investigation report. The doctor who performed the autopsy of Berry opined that the cause of death was compressional asphyxia, a form of strangulation where the structures of the neck are compressed. Cpl. Steve Wilder explained that he was the correctional officer whom Schroeder flagged down to remove Berry after Schroeder had choked him. Cpl. Joseph Eppens testified he had moved Schroeder from his cell following the incident. Eppens explained that Schroeder told him he had previously informed correctional staff he did not want a cellmate and that he joked, "[T]his is what happens when we watch UFC." Finally, a TSCI employee testified that he had notarized a writing in which Schroeder stated:

My name is Patrick Schroeder. I'm 40 years old and I killed Terry Berry on April 15[,] 2017[.] I killed Berry because I wanted to, I knew I was going to kill him the moment staff put him in my cell on April 10[,] 2017. . . .

I'm writing this statement to inform the court that if given another life term I will kill again and we will be right back in court doing this all over again.

The court allowed the parties to make arguments. Schroeder declined. On the aggravation allegation, the State noted that it provided a certified copy of Schroeder's previous murder conviction and testimony concerning the events leading to that conviction. As to mitigating circumstances, the State stated, in part:

[T]he State has offered evidence considering the statutory mitigating circumstances, and the purpose of the evidence was to affirmatively show that there were no statutory mitigators that exist in this case.

The circumstances to be considered for mitigation include whether or not the defendant acted under unusual pressure or influence. I want to emphasize the word "unusual." His justification[s] for his actions are more of a nuisance than they are unusual pressure.

It was displeasure or disagreement with a roommate and how the roommate either talked too much or his hygiene wasn't appropriate for . . . Schroeder's standards, and I don't think that constitutes unusual pressure or influence.

He's not under the . . . dominion of another. . . . Schroeder acted by himself, and I would say he probably was the boss in the cell.

There is no undue influence of extreme mental or emotional disturbance. . . . Schroeder was clear thinking, and by the evidence that's been presented, his thought process started almost immediately upon . . . Berry becoming his cellmate. And in his written statement, that is really clear. And even in his interview with the investigator, he

started thinking about this several days before it actually happened.

So he wasn't under any influence of extreme mental or emotional disturbance. This was a thought process deliberate and pretty cold blooded.

. . . .

The evidence shows that he was the sole person committing this crime. There is no accomplice. And his participation is the . . . death-causing participation.

The State would argue that . . . Berry's habits as described by [Schroeder do] not make him a participant [in the incident].

. . . .

[Schroeder] was a prisoner at the institution. No evidence of impairment. The only evidence is that he's clearheaded, he's thinking, and he planned.

ORDER OF SENTENCE

In the panel's order of sentence, the panel found the State proved the aggravation allegation beyond a reasonable doubt, citing Schroeder's previous conviction and the testimony describing the events leading to that conviction.

The panel also addressed possible statutory mitigating circumstances, noting, "The State was allowed to present evidence that is probative of the non-existence of statutory or non-statutory mitigating circumstances, and did so[, and Schroeder] was allowed to present evidence that is probative of the existence of a statutory or non-statutory mitigating circumstance[, but] chose not to . . . ." After analyzing each of the mitigating grounds defined by § 29-2523(2) and giving Schroeder the benefit of all inferences, the panel did not find there were any statutory mitigating circumstances.

The panel addressed various nonstatutory mitigating factors. The panel found two of these factors existed and weighed in Schroeder's favor, including that Schroeder's guilty plea spared Berry's family the trauma of a trial and the State the expense of

a trial and that Schroeder's childhood and family were dysfunctional. While finding three other factors did not exist, the panel noted the following: Schroeder is not well educated, but there is no evidence of a borderline intellect or diminished cognitive ability and he clearly knows right from wrong; Schroeder takes medication for depression, but there is nothing to suggest that this depression contributed to his actions and there is no evidence that his psychiatric or psychological history rises to the level of a mitigating circumstance; and the record does not suggest Schroeder has generally been a problem to officials during his confinement, but this prior conduct does not rise to the level of a mitigating factor. The panel acknowledged that Schroeder apparently "expressly welcomes a death sentence" but explained this was not considered and that "[i]t is the law, and not [Schroeder's] wishes, that compels this Panel's ultimate conclusion."

The panel concluded that the two nonstatutory mitigating circumstances were given little weight because these two factors did not approach or exceed the weight given to the aggravating circumstance. The panel then conducted a proportionality review and found that a sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. Based upon all of the above, the panel sentenced Schroeder to death.

## ASSIGNMENTS OF ERROR

Schroeder assigns, restated, that the sentencing court erred in (1) allowing the State to introduce evidence to rebut unpresented mitigating evidence, (2) failing to consider and properly weigh mitigating evidence from the presentence investigation report, (3) failing to request DCS documentation of Schroeder's time in custody for mitigation purposes, (4) sentencing Schroeder to death with insufficient safeguards to prevent arbitrary results, and (5) sentencing Schroeder to death after balancing the aggravating evidence and mitigating evidence and conducting the proportionality review.

## STANDARD OF REVIEW

[1] In a capital sentencing proceeding, this court conducts an independent review of the record to determine if the evidence is sufficient to support imposition of the death penalty.[2]

[2-4] When reviewing the sufficiency of the evidence to sustain the trier of fact's finding of an aggravating circumstance, the relevant question for this court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the aggravating circumstance beyond a reasonable doubt.[3] The sentencing panel's determination of the existence or nonexistence of a mitigating circumstance is subject to de novo review by this court.[4] In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.[5]

[5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[6]

[6] The constitutionality of a statute presents a question of law, which an appellate court independently reviews.[7]

## ANALYSIS

### Rebuttal of Mitigating Circumstances

[7] Under Nebraska law, the death penalty is imposed for a conviction of murder in the first degree only in those

---

[2] *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019).

[3] *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012).

[4] *Jenkins, supra* note 2.

[5] *Id*.

[6] *Torres, supra* note 3.

[7] *Jenkins, supra* note 2.

instances when the aggravating circumstances existing in connection with the crime outweigh the mitigating circumstances.[8] When, as here, a defendant waives the right to a jury determination of alleged aggravating circumstances, the process for a sentencing panel to consider, find, and weigh the applicable aggravating and mitigating circumstances is set out by Neb. Rev. Stat. § 29-2521(2) (Cum. Supp. 2018). Section 29-2521(2) states:

In the sentencing determination proceeding before a panel of judges when the right to a jury determination of the alleged aggravating circumstances has been waived, the panel shall . . . hold a hearing. At such hearing, evidence may be presented as to any matter that the presiding judge deems relevant to sentence and shall include matters relating to the aggravating circumstances alleged in the information, to any of the mitigating circumstances set forth in section 29-2523, and to sentence excessiveness or disproportionality. The Nebraska Evidence Rules shall apply to evidence relating to aggravating circumstances. Each aggravating circumstance shall be proved beyond a reasonable doubt. Any evidence at the sentencing determination proceeding which the presiding judge deems to have probative value may be received. The state and the defendant or his or her counsel shall be permitted to present argument for or against sentence of death.

The mitigating circumstances required to be considered under § 29-2521 and set forth in § 29-2523(2) include:

(a) The offender has no significant history of prior criminal activity;

(b) The offender acted under unusual pressures or influences or under the domination of another person;

(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;

(d) The age of the defendant at the time of the crime;

---

[8] Neb. Rev. Stat. § 29-2519 (Cum. Supp. 2018).

(e) The offender was an accomplice in the crime committed by another person and his or her participation was relatively minor;

(f) The victim was a participant in the defendant's conduct or consented to the act; or

(g) At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication.

[8] Schroeder initially claims that the sentencing panel erred by allowing the State to present evidence to rebut the statutory mitigating circumstances even though Schroeder did not offer any evidence on mitigation. In making this claim, Schroeder cites the proposition that rebuttal evidence is confined to new matters first introduced by the opposing party and limited to that which explains, disproves, or counteracts the opposing party's evidence.[9]

[9-11] Contrary to Schroeder's assertions under this assignment, a sentencing panel has the discretion to hear evidence to address potential mitigating circumstances regardless of whether the defendant presents evidence on that issue. As quoted above, § 29-2521(2) allows a sentencing panel to receive "[a]ny evidence" at the sentencing proceeding which the presiding judge deems to have probative value relevant to the sentence including to any of the statutory mitigating circumstances.[10] A sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence.[11] Although § 29-2521(2) dictates that the Nebraska Rules of Evidence

---

[9] See *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010). See, also, *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

[10] See *Jenkins, supra* note 2.

[11] *Id.*

apply when determining the aggravating circumstances alleged by the information, it contains no such requirement for consideration of mitigating circumstances. Because a sentencing panel is required to consider and weigh any mitigating circumstances in imposing a sentence of death, the introduction of evidence of the existence or nonexistence of these potential mitigators has probative value to the sentence. Thus, the panel could permit the State to present evidence to contradict potential mitigators even though Schroder failed to present affirmative evidence.

Schroeder argues the State's evidence purported to rebut the statutory mitigating circumstances was actually offered to support uncharged aggravating circumstances. Specifically, Schroeder alleges the State's evidence was offered to show the nonstatutory aggravating circumstance of future dangerousness and "both prongs"[12] of § 29-2523(1)(d), which provides a statutory aggravator when a murder was especially heinous, atrocious, or cruel or manifested exceptional depravity by ordinary standards of morality and intelligence.

During the portion of the hearing devoted to mitigating circumstances, the State's evidence related to Berry's murder. Lundgren testified about her interview with Schroeder where he described how and why he killed Berry. This same interview was also described in the presentence investigation report. The doctor who performed the autopsy on Berry explained that Berry was killed by strangulation. Wilder explained the events surrounding his discovery of Berry's murder and Schroeder's reaction. Eppens explained that Schroeder told him he had previously informed correctional staff he did not want a cellmate and joked, while Eppens was moving him following the discovery of Berry's unconscious body, "[T]his is what happens when we watch UFC." Additionally, through the testimony of a TSCI employee, the State introduced a notarized writing in which Schroeder confessed, explained his reasons for killing Berry, and stated he would kill again if given another life term.

---

[12] Brief for appellant at 28.

This evidence surrounding Berry's murder was relevant to the statutory mitigating circumstances the panel was required to consider. The mitigating circumstances listed under § 29-2523(2) involve, in part, circumstances surrounding the underlying crime. These circumstances include pressure or influences which may have weighed on the defendant, potential influence on the defendant of extreme mental or emotional disturbance at the time of the offense, potential victim participation or consent to the act, the defendant's capacity to appreciate the wrongfulness of the act at the time of the offense, and any mental illness, defect, or intoxication which may have contributed to the offense.[13] The State's evidence informed the panel's analysis and was relevant to consideration of these mitigators; and, as explained above, the panel had discretion to hear this evidence.

Schroeder fails to allege that the introduction of this evidence influenced the panel's finding of the existence of the charged aggravator—namely that Schroeder had been convicted of another murder, been convicted of a crime involving the use or threat of violence to the person, or had a substantial prior history of serious assaultive or terrorizing criminal activity.[14] It is undisputed that Schroeder had previously been convicted of the murder of Albers and was incarcerated for that crime at the time of Berry's killing. Schroeder does not challenge the presentation of evidence related to this aggravating circumstance for failing to comply with the Nebraska Evidence Rules.[15]

The panel had discretion to hear any evidence relevant to sentencing, the panel was required to consider mitigating circumstances even though Schroeder failed to allege or present evidence in support of them, and the evidence presented by the State was relevant to the panel's review of these mitigators. As such, the panel did not err in allowing the State to present evidence on the existence of mitigating circumstances.

---

[13] § 29-2523(2).

[14] § 29-2523(1)(a).

[15] See § 29-2521(2).

### Weighing of Mitigating Circumstances

Schroeder next assigns the panel failed to properly consider mitigating information contained within the presentence investigation report and available from the State's evidence. Schroeder claims proper consideration of this evidence would have led the panel to find additional statutory and nonstatutory mitigating circumstances.

[12] As explained, § 29-2521 requires a sentencing panel to consider mitigating circumstances. Neb. Rev. Stat. § 29-2522 (Cum. Supp. 2018) describes the weighing of the aggravating and mitigating circumstances in imposing a sentence of death and requires that the determination be in writing and refer to the aggravating and mitigating circumstances weighed. Accordingly, the sentencing order must specify the factors it relied upon in reaching its decision and focus on the individual circumstances of each homicide and each defendant.[16]

We first address Schroeder's claims that the panel should have applied additional nonstatutory mitigating evidence, including (1) that the State had ulterior motives for pursuing the death penalty to avoid and detract from potential civil liability for failing to protect Berry, (2) that Schroeder was institutionalized from consistent incarceration, and (3) that Schroeder had used money elicited from his murder of Albers to provide clothes and food for his family.

[13,14] The U.S. Constitution does not require the sentencing judge or judges to make specific written findings with regard to nonstatutory mitigating factors.[17] In *State v. Jenkins*,[18] we addressed an assignment of a sentencing panel failing to address nonstatutory mitigators and explained that

---

[16] *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001).

[17] *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008). Accord *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359, *cert. granted and judgment vacated* 498 U.S. 964, 111 S. Ct. 425, 112 L. Ed. 2d 409 (1990).

[18] *Jenkins, supra* note 2.

we will not fault the panel for failing to discuss a nonstatutory mitigating circumstance that it was not specifically asked to consider.

Additionally, the underlying facts Schroeder uses as support for these nonstatutory mitigators are included in the presentence investigation report which the panel explained it considered in determining his sentence. The panel also specifically acknowledged many of these facts in its sentencing order. On the allegation that the State had ulterior motives due to potential liability, the panel explained the cell Schroeder and Berry shared was intended for a single inmate, Berry was set for release 2 weeks after moving in with Schroeder, Schroeder was serving a life sentence for Albers' murder, and Schroeder warned that issues might arise if he were incompatible with whoever was assigned as his roommate. As to institutionalization, the panel described Schroeder's current incarceration for Albers' murder and noted his dysfunctional childhood and that "[h]e was involved in the juvenile court at a young age." Finally, on the use of money he attained from Albers' murder, the panel described that he took several thousand dollars from Albers after leaving him for dead and "drove around the area, paying off bills and making purchases." It is clear the panel considered and weighed these facts even though it did not state a finding that they led to the specific nonstatutory mitigating circumstances Schroeder presently claims.

Because the panel was not required to make specific written findings on the application of nonstatutory mitigating factors, and taking into account the panel's consideration of the facts Schroeder alleges support these factors, Schroeder's claims involving the nonstatutory mitigators do not demonstrate reversible error.

We next turn to Schroeder's claim that the panel failed in its analysis of statutory mitigating circumstances. Of the statutory mitigating factors, Schroeder claims the panel should have determined the following applied: Schroeder acted under unusual pressures or influences or under the domination

of another person,[19] Berry's murder was committed while Schroeder was under the influence of extreme mental or emotional disturbance,[20] and Berry was a participant in Schroeder's conduct or consented to the act.[21]

For Schroeder's claims that he was under unusual pressures or influences and extreme mental or emotional disturbance, he first alleges the panel failed to acknowledge his efforts to get Berry removed as a cellmate and his incompatibility with Berry. He supports this allegation by referencing the panel's determination that Schroeder had calculated Berry's murder for several days and chose no method of obviating his annoyance. Schroeder further quoted the panel's explanation that finding the kite in the trash "suggests a premeditative and depraved mentality" in that Schroeder "did not ask that [Berry] be moved" and in that Schroeder "did not tell the guards that . . . Berry was in mortal danger if he were not moved."

Schroeder contends this determination and the findings supporting it are contradicted by the evidence. Specifically, Schroeder points to the summaries of his interviews with Lundgren, included in the presentence investigation report, wherein he told Lundgren that he had "'told all of the staff'" that he did not want Berry as a cellmate, that he told staff members he was not compatible with Berry when they assigned him to Schroeder's cell, that a TSCI caseworker had tried to get the assignment switched prior to Berry's moving in, and that corrections officers would laugh at the arrangement and joke they were surprised Schroeder had not killed Berry yet. Schroeder also points to Lundgren's case synopsis noting that the TSCI caseworker Schroeder described in his interview explained that she did have concerns prior to Berry's moving into the cell based on a "'gut feeling'" that the arrangement would be "'a bad idea'" but that she was unsuccessful in getting it switched.

---

[19] See § 29-2523(2)(b).

[20] See § 29-2523(2)(c).

[21] See § 29-2523(2)(f).

However, the panel's statements that Schroeder did not ask for Berry to be moved and did not warn that Berry was in mortal danger are not contradicted by Lundgren's summaries. Lundgren's summary of Schroeder's interview only described Schroeder's assertions that he told staff prior to Berry's moving in that he did not want Berry as a cellmate and was incompatible with him. Lundgren's summary did not describe that Schroeder asserted he continued these complaints after the move was made and did not allege he made any actual requests for Berry to be moved. Moreover, there is nothing in Schroeder's description of his interactions with TSCI officials where he indicated Berry was in mortal danger if they continued to share the cell. While Schroeder alleged corrections officers would joke they were surprised he had not killed Berry yet, such statements do not imply that Schroeder requested that Berry be moved or that they believed or had reason to believe that Berry was actually in mortal danger. Similarly, while the TSCI caseworker attempted to get Berry's assignment to Schroeder's cell switched prior to his move, there is nothing indicating that she was doing so at Schroeder's request or that her "'gut feeling'" was based upon a belief such an arrangement might lead to Berry's death.

The panel reviewed the presentence investigation report and Lundgren's summaries prior to determining whether there were mitigating circumstances. The panel's findings that Schroeder did not request Berry's removal from his cell and did not warn officials of potential danger to Berry is uncontradicted by the report. Instead, the report shows that Schroeder acted with premeditation and depravity in that Schroeder explained he had made up his mind to kill Berry days before he did so and in that he made no real attempts to avoid this result, even having made the decision to discard the kite which could have helped avoid the killing.

Schroeder's explanations in his interview that he killed Berry because he was unclean and annoying do not rise to the level of accounts of unusual pressure or influence or extreme

mental or emotional disturbance. Nothing in the record indicates that Schroeder continually sought Berry's removal from the cell or that any such requests were unheeded by TSCI staff.

Schroeder references the effect incarceration can have on inmates in support of his unusual pressures or influences and extreme mental or emotional disturbance claims. Schroeder cites to several articles, while acknowledging he did not provide them to the court because he did not present any evidence, which discuss the effects of institutionalization and incarceration in solitary confinement on an inmate's mental health as well as articles and reports of security and staffing issues at TSCI and DCS.

[15] We have previously addressed the effect incarceration and, specifically, isolated confinement can have on individuals. In *Jenkins*, we analyzed the application of a nonstatutory mitigating factor of solitary confinement and quoted the understanding that "'[y]ears on end of near-total isolation exact a terrible price.'"[22] However, we also noted that prison officials must have discretion to decide that in some instances, temporary solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates.[23] Because of the defendant's own extensive and violent actions in that case, the prison officials needed to have some recourse to deal with such an inmate, and we found that it was reasonable in not rewarding such behavior by considering the resulting confinement as a mitigating factor.[24] For the same reasons, the mere identification of a history of incarceration, without more, is insufficient to allege unusual pressures or influences or establish extreme mental or emotional

---

[22] *Jenkins, supra* note 2, 303 Neb. at 727, 931 N.W.2d at 888, quoting *Davis v. Ayala*, 576 U.S. 257, 135 S. Ct. 2187, 192 L. Ed. 2d 323 (2015) (Kennedy, J., concurring).

[23] *Jenkins, supra* note 2.

[24] *Id*.

disturbance. Schroeder's incarceration was due to his own actions, including, most recently, his murder of Albers.

Contrary to Schroeder's assertions and as discussed in our analysis of Schroeder's claims of the nonstatutory mitigating factors of institutionalization and the State's alleged ulterior motive to avoid possible litigation, the underlying facts of Schroeder's claims were acknowledged and weighed by the court. In its order, the panel acknowledged that the cell Schroeder and Berry shared was intended for a single inmate, Berry was set for release 2 weeks after moving in with Schroeder, Schroeder was serving a life sentence for Albers' murder, and Schroeder had a history of incarceration including his history within the juvenile court system and his current sentence for Albers' murder. The panel reasonably found that on their own, these facts and the reality of the effect incarceration can have on individuals were insufficient to establish that Schroeder acted under unusual pressures or influences or was under extreme mental or emotional disturbance. Under our de novo review, we reach the same conclusion.

Schroeder's remaining claim, that the panel erred in failing to find Berry was a participant in Schroeder's conduct or consented to the act, is without merit. Schroeder supports this proposition by noting, "Berry complied with Schroeder's request that he turn the chair around and face away from Schroeder after Schroeder expressed extreme annoyance with his behavior."[25] However, Berry's facing away from Schroeder does not indicate participation or consent to his murder. Schroeder expressed frustration and requested Berry to turn away from him. How Berry would have understood this as Schroeder's asking for aid in his strangulation and not as a method to avoid conflict is unclear. Schroeder offers no further argument to support this mitigating circumstance, and we agree with the panel's finding that there was no evidence establishing this mitigating factor.

---

[25] Brief for appellant at 40.

Duty to Request DCS Chapter 83
Custody Reports

Schroeder claims the panel had a duty to request additional records of Schroeder's incarceration from DCS. These records are required to be kept by DCS under Neb. Rev. Stat. § 83-178 (Reissue 2014) and include records concerning Schroeder's background, conduct, associations, and family relationships; records regarding Schroeder's "Central Monitoring,"[26] which may be relevant to the propriety of his placement with Berry; and any medical or mental health records.

[16-18] When an offender has been convicted of first degree murder and waives the right to a jury determination of an alleged aggravating circumstance, the court must order a presentence investigation of the offender and the panel must consider a written report of such investigation in its sentencing determination.[27] The presentence investigation and report shall include, when available, any submitted victim statements and an analysis of the circumstances attending the commission of the crime and the offender's history of delinquency or criminality, physical and mental condition, family situation and background, economic status, education, occupation, and personal habits.[28] The investigation and report may also include any other matters the probation officer deems relevant or the court directs to be included.[29]

In this case, the court ordered a presentence investigation and report, a report was prepared, and the panel considered it during its sentence determination. Schroeder does not allege this report failed to analyze and present any of the areas required by § 29-2261(3). Instead, Schroeder claims the court had a duty to request the presentence investigation report to include specific incarceration records. Schroeder relies on *State*

---

[26] *Id.* at 42.

[27] § 29-2521(2) and Neb. Rev. Stat. § 29-2261(1) (Reissue 2016).

[28] § 29-2261(3).

[29] *Id*.

*v. Dunster*[30] for this claim that the panel should have requested additional documents.

In that case, the defendant was sentenced to death after pleading guilty to first degree murder.[31] Prior to sentencing, the district court instructed the probation officer conducting the presentence investigation to include information in the possession of DCS as part of the report.[32] The court explained that access to this information was restricted by law and that it would not be released to the public except upon written order.[33] On appeal, the defendant assigned the district court's consideration of this information, which included confidential mental health information provided by DCS, as reversible error.[34] However, we found the district court had given adequate notice to the defendant of its intent to consider such evidence to satisfy his due process rights.[35]

Additionally, when the bill of exceptions was completed in that case, the DCS records were not included. As a result, we determined that in our de novo review, we could request and consider the additional documents just as the district court had requested and considered them.[36] In reaching this determination, we noted that our request of these documents did not indicate in advance how we would rule on appeal but merely followed our statutory requirements for review and honored the intent of the Legislature to provide "'the most scrupulous standards of fairness and uniformity'" in reviewing the imposition of a sentence of death.[37]

---

[30] *Dunster, supra* note 16.

[31] *Id*.

[32] *Id*.

[33] *Id*.

[34] *Id*.

[35] *Id*.

[36] *Id*.

[37] *Id*. at 372, 631 N.W.2d at 913.

*Dunster* neither explicitly nor implicitly required a lower court to receive and review documents of a defendant's prior incarceration. Instead, it only evaluated the process of a district court seeking to consider specific documents during a sentencing proceeding and our ability to review the same information upon which the lower court relied.[38] Accordingly, *Dunster* did not add further requirements for the preparation of a presentence investigation report under § 29-2261(3).

Because the district court complied with its duties under § 29-2261(1) in requesting the presentence investigation and report, because the presentence report included the requisite analysis of the § 29-2261(3) elements, and because there is no requirement that a sentencing court must request access to specific § 83-178 DCS records, the district court did not err by not requesting that the DCS records be included in the presentence investigation report.

## Sufficiency of Safeguards to Prevent Arbitrary Results

Schroeder claims Nebraska's death penalty is unconstitutional as applied to him under the 8th and 14th Amendments to the U.S. Constitution and article I, §§ 3, 9, and 15, of the Nebraska Constitution. Schroeder argues that insufficient safeguards exist to prevent arbitrary results when, as here, a defendant waives his right to counsel and refuses to introduce mitigating or proportionality evidence or argument.

[19,20] An accused has a state and federal constitutional right to be represented by an attorney in all critical stages of a criminal prosecution which can lead to a sentence of confinement.[39] However, a defendant may waive this right to counsel

---

[38] *Dunster, supra* note 16.

[39] See, U.S. Const. amends. VI and XIV; Neb. Const. art. I, § 11; *Scott v. Illinois*, 440 U.S. 367, 99 S. Ct. 1158, 59 L. Ed. 2d 383 (1979); *Argersinger v. Hamlin*, 407 U.S. 25, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972); *Jenkins, supra* note 2; *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997); *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

so long as the waiver is made knowingly, voluntarily, and intelligently.[40]

[21-23] The same constitutional provisions that provide a defendant the right to counsel also guarantee the right of the accused to represent himself or herself.[41] This right to self-representation plainly encompasses certain specific rights of the defendant to have his voice heard, including that the pro se defendant must be allowed to control the organization and content of his own defense.[42] We have previously explained that such control may include a waiver of the right to present mitigating evidence during sentencing in a death penalty case.[43]

Schroeder does not challenge the validity of his waiver of counsel for the penalty phase or his election not to present mitigating evidence or proportionality argument. Instead, Schroeder argues that the exercise of the right to self-representation and, derived therefrom, the right to waive the presentation of evidence and argument conflicted with the constitutional restrictions against cruel and unusual punishment. Specifically, Schroeder addresses the effect such waivers have on the proportionality review by the sentencing panel. To establish the cruelty and unusualness of such punishment, Schroeder notes first that the proportionality requirement under Neb. Rev. Stat. §§ 29-2521.01 to 29-2521.04 (Cum. Supp. 2018) only requires the sentencing panel to review those cases in which the death penalty was imposed. Schroeder also asserts proportionality review is further limited depending on whether jury determinations in the reviewed cases were waived because,

---

[40] *Jenkins, supra* note 2; *State v. Hessler*, 274 Neb. 478, 741 N.W.2d 406 (2007).

[41] *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *Jenkins, supra* note 2; *Wilson, supra* note 39; *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991).

[42] *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); *Dunster, supra* note 16; *Wilson, supra* note 39.

[43] *Dunster, supra* note 16.

when they are waived, a sentencing panel is required to issue written findings of fact as to any proven aggravating circumstances, but when there is no waiver, the jury does not issue such analysis. Schroeer argues that when a defendant waives counsel and refuses to meaningfully participate, the record on which the panel makes its proportionality determination is limited to what it requests and the State presents, which has the potential to be limited and biased in favor of the imposition of a death sentence.

[24,25] Because a death sentence is different from any other criminal penalty[44] and no system based on human judgment is infallible, we have taken, and should continue to take, the extra step to ensure fairness and accuracy with the imposition of the death penalty.[45] Taking this into account, the Legislature has enacted a statutory scheme to provide additional safeguards,[46] and in interpreting these statutes, we have followed the fundamental principle of statutory construction that penal statutes are to be strictly construed in favor of the defendant.[47]

[26] Part of this statutory scheme, as explained, requires a court to order a presentence investigation report.[48] The sentencing panel must consider this report in reaching its sentence. Thus, contrary to Schroeder's argument, even if the State presents evidence in favor of a specific sentence and the defendant declines to present contrary evidence, the court receives and must consider independent information from the report.

[27,28] In a death penalty case, the sentencing panel is required to review this report and determine whether it contradicts the State's evidence of aggravating factors and whether any mitigating circumstances exist, including specifically

---

[44] *State v. Hochstein and Anderson*, 262 Neb. 311, 632 N.W.2d 273 (2001).

[45] *Id*.

[46] Neb. Rev. Stat. §§ 29-2519 to 29-2546 (Cum. Supp. 2018).

[47] *Hochstein and Anderson, supra* note 44.

[48] §§ 29-2261(1) and 29-2521(2).

delineated statutory mitigators.[49] While the State must prove the aggravating circumstances beyond a reasonable doubt,[50] there is no burden of proof with regard to mitigating circumstances.[51] Accordingly, the panel's evaluation of the independently compiled presentence investigation report and any evidence the defendant chooses to introduce is under the less restrictive mitigation standard and provides another safeguard to ensure fairness and accuracy in a death penalty determination.

[29-32] Once the panel makes its determinations about the existence of aggravating and mitigating circumstances, the panel is then required to undertake a proportionality review. This review looks at whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.[52] Proportionality review is not constitutionally mandated.[53] It exists in Nebraska by virtue of §§ 29-2521.01 to 29-2521.04, which direct this court to conduct a proportionality review in each appeal in which a death sentence is imposed.[54] A court's proportionality review spans all previous cases in which a sentence of death is imposed and is not dependent on which cases are put forward by the parties.[55]

Schroeder takes issue with proportionality review requiring a panel to compare only those cases in which the death penalty was imposed.[56] Instead, Schroeder argues the statutory scheme explicitly requires review of all homicide cases regardless of the resulting sentence.

---

[49] §§ 29-2521 to 29-2523.

[50] *Torres, supra* note 3.

[51] *State v. Vela*, 279 Neb. 94, 777 N.W.2d 266 (2010); *State v. Victor*, 235 Neb. 770, 457 N.W.2d 431 (1990).

[52] § 29-2522(3).

[53] *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

[54] *Id*.

[55] See *id.*

[56] See *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), *overruled on other grounds, State v. Chambers*, 233 Neb. 235, 444 N.W.2d 667 (1989).

It is unclear how Schroeder is arguing this fits under his assignment alleging unconstitutionality in the interplay of his waiver of counsel and election not to present evidence or argument with Nebraska's capital sentencing scheme. The introduction of further evidence or whether or not Schroeder was represented by counsel does not affect what previous cases the panel was required to consider. In any case, we decline Schroeder's invitation to overrule our decision in *State v. Palmer*[57] which interpreted §§ 29-2521.01 to 29-2521.04 to only require review of previous cases in which the death penalty was imposed.

Additionally, we are unconvinced by Schroeder's claim that the proportionality review is unconstitutionally flawed due to having less analysis of the reviewed cases in which a jury determines the existence of the aggravating circumstance than of the reviewed cases in which a sentencing panel makes the determination. Again, it is unclear how Schroeder relates this alleged flaw to this assignment. If Schroeder is claiming that waiver of counsel and lack of argument would prohibit the panel from taking into account that previous aggravation determinations were decided by juries, this information would be apparent from the previous opinions and would be able to be considered by the panel independently of whether the defendant or an advocate explained such difference to the panel.

[33,34] Moreover, even when a jury determines the existence of an aggravating circumstance, a sentencing panel is required to put in writing its consideration of (1) whether the determined aggravating circumstance justifies the imposition of a sentence of death, (2) whether mitigating circumstances exist, and (3) whether a sentence of death would be excessive or disproportionate to penalties imposed in similar cases.[58] This writing must specifically refer to the aggravating and mitigating circumstances weighed in the determination of the panel.[59]

---

[57] *Id*. See, also, *State v. Gales, supra* note 53.

[58] § 29-2522.

[59] *Id*.

As such, the basis of Schroeder's argument that cases where a jury determines the existence of aggravating circumstances provide insufficient information for comparison in a proportionality review is without merit.

[35-38] Considering all of the above, Nebraska's capital sentencing scheme provides additional statutory steps and considerations to ensure fairness and accuracy, and these safeguards exist regardless of a defendant's strategy at the penalty phase. Due to this statutory scheme, a defendant cannot "choose" the death penalty. The sentencing decision rests with the court alone.[60] In order to exercise this authority, the statutory scheme requires that a sentencing panel consider not only evidence and argument presented by the parties but also an independently compiled presentence investigation report to determine whether the alleged aggravating circumstance exists, determine whether any mitigating factors are present which would weigh against the imposition of the death penalty, and conduct a proportionality review weighing the aggravating and mitigating factors and comparing the facts to previous cases where the death penalty was imposed.[61] These considerations exist and are weighed regardless of the evidence presented by the parties or their arguments.

[39,40] A defendant is entitled to present a defense and is guaranteed the right to choose the objectives for that defense.[62] As previously stated, the self-represented defendant must be allowed to control the organization and content of his own defense.[63] However, Schroeder suggests that in a death penalty case, the substantial nature of the proceedings requires an advocate in opposition to a sentence of death irrespective of the defendant's chosen objective. To this end, he suggests §§ 29-2519 to 29-2546 implicitly require the appointment of a

[60] *Dunster, supra* note 16.

[61] See *Torres, supra* note 3.

[62] *McCoy v. Louisiana*, ___ U.S. ___, 138 S. Ct. 1500, 200 L. Ed. 2d 821 (2018); *Jenkins, supra* note 2.

[63] *Dunster, supra* note 16.

guardian ad litem to present evidence and argument as to why the death penalty should not be imposed.

[41] This suggestion is similar to that addressed in *Dunster*.[64] The defendant therein had waived trial counsel for the penalty stage and chose not to present any mitigating evidence. On appeal, he claimed the court should have appointed "amicus counsel" to advocate against the imposition of the death penalty by presenting evidence and "'argu[ing] for life,'" which is identical to the role Schroeder now envisions for an appointed guardian ad litem.[65] As noted in *Dunster*, when a defendant waives counsel and the presentation of mitigating evidence, the appointment of an advocate to present evidence and argue against the imposition of a sentence overrides that defendant's constitutional right to control the organization and content of his or her own defense during sentencing.

[42,43] A criminal defendant has the right to waive counsel and present his or her own defense.[66] In a death penalty case, this includes the right of the defendant to elect not to present additional evidence or argument during the penalty proceedings. Even if a defendant makes such waiver and election, the Legislature has enacted safeguards to ensure fairness and accuracy in the resulting sentence. As explained above, these safeguards apply regardless of the defense strategy an individual defendant implements. Therefore, Schroeder's assignment that Nebraska's capital sentencing scheme is unconstitutional due to insufficient safeguards to prevent arbitrary results when a defendant waives counsel and elects not to present evidence or argument fails.

## Excessiveness and Proportionality Review

[44,45] In reviewing a sentence of death, we conduct a de novo review of the record to determine whether the

---

[64] *Id.*

[65] *Id.* at 361, 631 N.W.2d at 906.

[66] See *Dunster, supra* note 16.

aggravating and mitigating circumstances support the imposition of the death penalty.[67] In so doing, we consider whether the aggravating circumstances justify imposition of a sentence of death and whether any mitigating circumstances found to exist approach or exceed the weight given to the aggravating circumstances.[68]

We first note Schroeder does not contest the factual basis for the § 29-2523(1)(a) aggravation allegation that Schroeder was convicted of Albers' murder. It is undisputed that in 2006, Schroeder murdered Albers, who was at the time Schroeder's 75-year-old previous employer. It is also undisputed that Albers was robbed and that Schroeder had made the decision to kill Albers days before the robbery. Schroeder threatened and beat Albers, tied him up, threw him in the back of a pickup, and dumped him in an abandoned well, leaving him for dead. Based upon our de novo review, we determine this murder conviction, which was proved beyond a reasonable doubt at the sentencing hearing, is sufficient as an aggravating circumstance under § 29-2523(1)(a) to justify the imposition of the death penalty. In coordination with our analysis concerning the panel's mitigating circumstance findings, we also agree with the panel's determination that the applicable statutory and nonstatutory circumstances apparent from the record do not approach or exceed the aggravating circumstance in this case.

[46-48] In addition, we are required, upon appeal, to determine the propriety of a death sentence by conducting a proportionality review, comparing the aggravating and mitigating circumstances with those present in other cases in which a court imposed the death penalty.[69] The purpose of this review is to ensure that the sentences imposed in this case are no greater than those imposed in other cases with the same or similar

---

[67] *Torres, supra* note 3.

[68] *Id*.

[69] *Id.*

circumstances.[70] Our proportionality review looks only to other cases in which the death penalty has been imposed and requires us to compare the aggravating and mitigating circumstances of the case on appeal with those present in those other cases.[71]

In this case, we have reviewed our relevant decisions on direct appeal from other cases in which the death penalty was imposed.[72]

Like the sentencing panel, we find *Dunster* particularly pertinent to our review.[73] The defendant therein was convicted of murdering his cellmate by strangling him with an electrical cord.[74] The defendant had previously been convicted of the earlier murder of a woman while attempting to collect a debt from her husband, and he had confessed to a different murder of another inmate while incarcerated for the first murder.[75] At the penalty phase, the State alleged a single aggravating circumstance of § 29-2523(1)(a) and presented evidence of the two previous killings.[76] After the trial court sentenced the defendant to death, we affirmed.[77] Such factual basis is similar to that in the instant case. As did the defendant in *Dunster*, Schroeder murdered his cellmate by strangulation. Schroeder's previous murder of Albers was also pursuant to a plan to take money from his victim.

---

[70] See *id*.

[71] *Id*.

[72] See, e.g., *Jenkins, supra* note 2; *Torres, supra* note 3; *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011); *Hessler, supra* note 40; *Dunster, supra* note 16; *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999); *State v. Williams*, 253 Neb. 111, 568 N.W.2d 246 (1997); *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989); *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986); *State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979).

[73] *Dunster, supra* note 16.

[74] *Id*.

[75] *Id*.

[76] *Id*.

[77] *Id*.

Schroeder attempts to differentiate his case from *Dunster* by emphasizing that while only one aggravating circumstance was alleged in *Dunster*, the allegation therein concerned two previous murders. Additionally, Schroeder argues those underlying murders were committed with more serious facts, including that there was suspected sexual assault of one of the victims.

First, it is not evident that the underlying murders in *Dunster* included any more or less serious facts surrounding their execution. Schroeder threatened, beat, and robbed Albers and threw him bound and alive into a well to die. The murders the defendant in *Dunster* committed involved binding, beating, killing, and possible sexual assault. In both cases, the defendants acted with violence toward the persons.

[49,50] Additionally, while there were two underlying murders in *Dunster*, this does not mean *Dunster* cannot be used in a proportionality review. A proportionality review does not require that a court "color match" cases precisely.[78] It would be virtually impossible to find two murder cases which are the same in all respects.[79] Instead, the question is simply whether the cases being compared are sufficiently similar, considering both the crime and the defendant, to provide the court with a useful frame of reference for evaluating the sentence in this case.[80] As the factual connections show, *Dunster* is sufficiently similar for purposes of evaluating proportionality.

[51-53] Along the same lines, Schroeder attempts to distinguish his case from others cited by the sentencing panel and reviewed on appeal by noting that the majority of those cases had multiple aggravating factors. However, we have established that one aggravating circumstance may be sufficient under our statutory system for the imposition of the death penalty.[81] In

[78] *Ellis, supra* note 72.

[79] *Id*.

[80] *Id*.

[81] *Dunster, supra* note 16.

our proportionality review, the evaluation of whether the death penalty should be imposed in a specific case is not a mere counting process of "X" number of aggravating circumstances and "Y" number of mitigating circumstances and, instead, asks whether the reviewed cases are sufficiently similar to provide a useful reference for that evaluation.[82] Thus, even though other cases may involve additional or different aggravating circumstances, they may still be sufficiently similar to provide such reference.

Having reviewed our previous cases which have affirmed the imposition of a death penalty and compared the aggravating and mitigating circumstances present in those cases, we are persuaded that the sentence imposed in this case is not greater than those imposed in other cases with the same or similar circumstances. Accordingly, we affirm Schroeder's death sentence.

## CONCLUSION

In consideration of all of the above, Schroeder's conviction and sentence for first degree murder are affirmed.

AFFIRMED.

FREUDENBERG, J., not participating.

---

[82] See, *Ellis, supra* note 72; *Dunster, supra* note 16.